**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SHANE M. WILKINSON**<br><br>        **Plaintiff,**<br><br>    **v.**<br><br>**PINNACLE LODGING, LLC, MY HOSPITALITY SERVICES, LLC, YOGESH PATEL, LAURA ROSA, AND RUSSELL BLOCK**<br><br>        **Defendant.** | **CIVIL NO. 2:20-CV-3427** |

## COMPLAINT

Plaintiff Shane M. Wilkinson asserts his causes of action against defendants Pinnacle Lodging, LLC, My Hospitality Services, LLC, Yogesh "Chris" Patel, Laura Rosa, and Russell Block as follows:

### THE PARTIES

1.     Plaintiff is Shane M. Wilkinson, a person of age and majority, who is a Louisiana citizen and a resident of St. Tammany Parish.

2.     Defendant is Pinnacle Lodging, LLC ("Pinnacle"), a domestic limited liability company organized, registered, headquartered, and actively doing business in Louisiana, with its headquarters located in Covington, Louisiana.

3.     Upon information and belief, Pinnacle Lodging, LLC has two members, one of which is Yogesh "Chris" Patel.

4.     Named Defendant herein is My Hospitality Services, LLC ("MHS"), a foreign limited liability company organized, registered, and headquartered in Mississippi, but upon information and believe actively doing business in Louisiana.

5.      Upon information and belief, My Hospitality Services, LLC has two members, one of which is Yogesh "Chris" Patel.

6.      Defendant is Yogesh "Chris" Patel, a person of age and majority, who upon information and belief is a Louisiana citizen and a resident of St. Tammany Parish.

7.      Named Defendant herein is Laura Rosa, a person of age and majority, who upon information and belief is a citizen and resident of Louisiana.

8.      Named Defendant herein is Russell Block, a person of age and majority, who upon information and belief is a citizen and resident of Louisiana.

**JURISDICTION AND VENUE**

9.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. §§ 2000e-2 *et seq*. (Title VII) and 2000e-3 *et seq*. (Title VII's anti-retaliation provision); and 42 U.S.C. § 1981 *et seq*. (discrimination in contracts based on race and retaliation), as more particularly set-out herein.

10.      The Court has supplemental, subject-matter jurisdiction over Mr. Wilkinson's Louisiana state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to his federal law claims that they form part of the same case or controversy as more particularly set-out herein.

11.      The Court has personal jurisdiction over Pinnacle because it is a domestic limited liability company organized in Louisiana, headquartered in Covington, and registered and actively doing business in Louisiana, and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

12.      Alternatively, the Court has personal jurisdiction over Pinnacle as it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed unlawful employment

acts within Louisiana giving rise to the causes of action in this case, and derives substantial revenue from the services it provides in Louisiana. Thus, Pinnacle has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

13.    The Court has personal jurisdiction over MHS because it is a foreign limited liability company registered and actively doing business in Louisiana, and, through its registered agent for the service of process, Yogesh "Chris" Patel, is present within Louisiana at the time this suit commenced.

14.    Alternatively, the Court has personal jurisdiction over MHS because, upon information and belief, it regularly transacts business in Louisiana and regularly employs Louisiana citizens, committed unlawful employment acts within Louisiana giving rise to the causes of action in this case, and derives substantial revenue from the services it provides in Louisiana. Thus, MHS has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

15.    The Court has personal jurisdiction over Yogesh Patel because, upon information and belief, he is a Louisiana citizen and physically present within Louisiana at the time this lawsuit commenced.

16.    Alternatively, the Court has personal jurisdiction over Yogesh Patel as he committed the unlawful employment acts giving rise to this case while physically present in Louisiana, and thus has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment

of the Constitution of the United States.

17.      The Court has personal jurisdiction over Laura Rosa because, upon information and belief, she is a Louisiana citizen and physically present within Louisiana at the time this lawsuit commenced.

18.      Alternatively, the Court has personal jurisdiction over Laura Rosa as she committed the unlawful employment acts giving rise to this case while physically present in Louisiana, and thus has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

19.      The Court has personal jurisdiction over Russell Block because, upon information and belief, he is a Louisiana citizen and physically present within Louisiana at the time this lawsuit commenced.

20.      Alternatively, the Court has personal jurisdiction over Russell Block as he committed the unlawful employment acts giving rise to this case while physically present in Louisiana, and thus has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

21.      Venue for Mr. Wilkinson's Title VII claims are proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) (Title VII's venue provision) because (1) the unlawful employment practices alleged herein were committed in Louisiana within this judicial district (specifically St. Tammany Parish), (2) Mr. Wilkinson would be employed in this judicial district (same) but for his discriminatory termination, and (3) upon information and belief the employment records relevant to this action are found within this judicial district (same).

22.     Venue for Mr. Wilkinson's Section 1981 and supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Mr. Patel, Ms. Rosa, and Mr. Block (the individual defendants) actually reside in this forum (specifically, St. Tammany Parish) and Pinnacle and MHS (the company-entity defendants) are each susceptible to this Court's personal jurisdiction in this forum.

23.     Alternatively, Venue for Mr. Wilkinson's Section 1981 and supplemental state-law claims is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all defendants' unlawful acts, as well as Mr. Wilkinson's resulting injuries and damages, giving rise to this lawsuit occurred within this judicial district (specifically, St. Tammany Parish) and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PROCEDURAL AND STATUTORY REQUIREMENTS

24.     Upon information and belief, Yogesh "Chris" Patel is the owner and manager of numerous hotels and motels throughout Louisiana and Mississippi, and created My Hospitality Services, LLC to operate his hotel and motel business.

25.     Upon information and belief, for every hotel or motel property Mr. Patel acquires, he creates what amounts to a "shell," subsidiary company that "owns" that individual hotel or motel business.

26.     Relevant to this case, Mr. Patel and MHS acquired the Hampton Inn Hotel located in Covington, Louisiana, and created Pinnacle Lodging, LLC for the purpose of "owning" the property.

27.     Nevertheless, upon information and belief, at all times Mr. Patel, and his company MHS, were the ultimate decision-makers over all material aspects of the Hampton Inn business.

28.     Upon information and belief, MHS employees Russell Block and Laura Rosa were the decision-makers responsible for the day-to-day operation of Pinnacle Lodging, LLC and the Hampton Inn business.

29.     Upon information and belief, MHS provided substantial other resources to Pinnacle, such that Pinnacle relied upon and was completely dominated by MHS.

30.     In fact, based on the totality of circumstances, My Hospitality Services, LLC and Pinnacle Lodging, LLC constitute a single, integrated business enterprise.

31.     Alternatively, based on the totality of circumstances, Pinnacle is merely the alter-ego of MHS.

32.     Alternatively, based on the totality of circumstances, Pinnacle is merely the alter-ego of Yogesh Patel.

33.     On or about November 2017, MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise, hired Mr. Wilkinson as a full-time employee assigned to the Hampton Inn in Covington, Louisiana.

34.     On or about December 19, 2019, MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise, terminated Mr. Wilkinson's employment.

35.     The MHS decision-makers who actually terminated Mr. Wilkinson's employment were Laura Rosa and Russell Block.

36.     Upon information and belief, the MHS decision-maker who either directed or approved Ms. Rosa and Mr. Block to terminate Mr. Wilkinson's employment was the owner of both MHS and Pinnacle, Yogesh Patel.

37.     Upon information and belief, Mr. Yogesh, Mr. Block, Ms. Rosa, MHS, and Pinnacle terminated Mr. Wilkinson's employment because of his race, color, national origin, sex, and in

retaliation for lodging protected complaints with management regarding unlawful discrimination and hostile work environment.

38.    Additionally, or alternatively, Mr. Yogesh, Mr. Block, Ms. Rosa, MHS, and Pinnacle terminated Mr. Wilkinson's employment because he had lodged protected complaints with management regarding what Mr. Wilkinson perceived to be safety and environmental violations at the Hampton Inn, specifically an uncontrolled and systemic infestation of mold throughout the hotel property that Mr. Wilkinson believed could pose a danger to the health and safety of himself, hotel staff, and guests.

39.    On or about June 19, 2020, within 300 days of his termination and last adverse employment action, Mr. Wilkinson timely filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office alleging that MHS and Pinnacle unlawfully discriminated against and terminated Mr. Wilkinson based on his race, color, national origin, sex, and in retaliation for making protected complaints regarding this discrimination, and regarding what Mr. Wilkinson perceived as safety and environmental violations at the Hampton Inn business, in violation of Title VII, Louisiana's Environmental Whistleblower Statute, and Louisiana's Whistleblower Statute (EEOC No. 461-2020-00550).

40.    On December 15, 2020, the EEOC issued Mr. Wilkinson a Notice of Right to Sue in this matter.

41.    Mr. Wilkinson timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

### A.    The Plaintiff – Shane Wilkinson

42.    Shane Wilkinson is a 39-year-old husband and father who lives with his family in

Covington, Louisiana.

43.     Mr. Wilkinson applied for a front desk position with the Hampton Inn in Covington in 2017.

44.     MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise hired Mr. Wilkinson on or about November 2017.

45.     Due to his excellent professional performance and excellent work ethic, Mr. Wilkinson quickly received a number of promotions, and during the summer of 2019 was promoted to General Manager of the Hampton Inn in Covington.

46.     At the time of his termination, Mr. Wilkinson was still the General Manager of the Hampton Inn in Covington.

47.     For most of the relevant time as alleged herein, Mr. Wilkinson reported directly to Laura Rosa as his immediate supervisor.

48.     Mr. Wilkinson's second-level supervisor was Russell Block.

49.     Mr. Wilkinson's ultimate decision-maker was Yogesh "Chris" Patel.

50.     MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise terminated Mr. Wilkinson's employment on or about December 19, 2019.

**B.     The Defendants – Yogesh Patel, His Companies MHS and Pinnacle, and His Employees Russell Block and Laura Rosa**

51.     Pinnacle is a Louisiana limited liability company formed in August 2013.

52.     Upon information and belief, Pinnacle does not sell goods or services to the general public, but simply acts as an asset holder for the Hampton Inn in Covington and as a liability shield for its only natural member Yogesh Patel, who is the sole member of Pinnacle's juridical member, My Investments LLC.

53.     Pinnacle is a closely held company that, upon information and belief, is exclusively

8

controlled by Yogesh Patel.

54.    Further, Pinnacle does not appear to have a company website, independent company offices, independent business address, an independent mailing address or company phone numbers.

55.    Instead, the business address associated with Pinnacle is the physical address for its primary asset, the real property and structures occupied by the Hampton Inn of Covington.

56.    Instead, the mailing address associated with Pinnacle with the Louisiana Secretary of State appears to be the residential address of Yogesh Patel.

57.    Upon information and belief, Pinnacle is not properly capitalized.

58.    Upon information and belief, Pinnacle may have few or no bona fide employees (instead, all employees working at the Hampton Inn property in Covington, upon information and belief, are practically or actually employed by MHS).

59.    Upon information and belief, all senior management and other resources relied upon by Pinnacle are actually provided by MHS.

60.    Upon information and belief, what movable assets Pinnacle does own are fluidly moved between Yogesh Patel's many LLCs without formalities and as if all of his many organizations are really a single, integrated entity under his exclusive control or, under the control of Mr. Patel's other alter-ego companies).

61.    MHS Director of Operations, Mr. Russell Brock, previously told Mr. Wilkinson that Block had to "rob Peter, to pay Paul" when he requested or ordered that assets and equipment be moved from one hotel to another, even though, upon information and belief, each hotel and its assets were ostensibly owned by whichever LLC covered that particular hotel's assets.

62.    In turn, MHS is a Mississippi limited liability company formed in May 2008.

63.    In contrast to Pinnacle, MHS appears to have a dedicated website, dedicated phone number, dedicated offices, and multiple employees across Mississippi and Louisiana.

64.    Upon information and belief, all commercial activities associated with Pinnacle are actually accomplished and performed by Mr. Patel and MSH employees.

65.    Upon information and belief, and as described throughout this lawsuit, Pinnacle is merely a shell-entity created by Yogesh Patel to attempt to shield himself from financial and legal liability with regards to all commercial activity at the Hampton Inn in Covington.

66.    Upon information and belief, Pinnacle is so completely interrelated, financially dependent upon, controlled, and dominated by Yogesh Patel, that Pinnacle is Mr. Patel's alter-ego.

67.    Alternatively, upon information and belief, Pinnacle is so completely interrelated, financially dependent upon, controlled, and dominated by MHS, that Pinnacle is MHS's alter-ego.

68.    Alternatively, upon information and belief, Pinnacle is so completely interrelated, financially dependent upon, controlled, and dominated by MHS, that Pinnacle and MHS form a single, integrated, enterprise.

**C.    Mr. Wilkinson Excels at Hampton Inn in Covington**

69.    At all times during his employment, Mr. Wilkinson was an objectively excellent employee who quickly received merit-based promotions.

70.    On or about December 2017, MHS Director of Operations Russell Block promoted Mr. Wilkinson from his initial position of Front Desk Agent to Front Office Manager.

71.    On or about June 2018, Mr. Wilkinson was promoted to Assistant General Manager.

72.    On or about July/August 2018, MHS Director of Operations Russell Block again promoted Mr. Wilkinson to General Manager of the Hampton Inn hotel.

73.    At the time of his termination, Mr. Wilkinson earned $50,000 per year in salary.

74.     At all times during his employment, Mr. Wilkinson regularly communicated with and received instruction from his ultimate decision-maker, Yogesh Patel.

75.     Prior to approximately July 2019, Mr. Wilkinson's immediate supervisor was Russell Block, with whom Mr. Wilkinson maintained a professional relationship.

76.     Prior to approximately August 2019, Mr. Wilkinson had never received verbal or written discipline or reprimand for any reason.

**D.      Laura Rosa becomes Mr. Wilkinson's Immediate Supervisor and Begins her Campaign of Race, Color, National Origin, and Sex Discrimination**

77.     At all times relevant to this lawsuit, Laura Rosa was an employee of MHS.

78.     In approximately July 2019, Ms. Laura Rosa was hired or promoted to MHS Regional Director of Operations and became Mr. Wilkinson's direct supervisor.

79.     Ms. Rosa immediately began discriminating against Mr. Wilkinson and subjective him to a hostile work environment based on his race (white), national origin (United States), color (white), and sex (male).

80.     The crux of Ms. Rosa's animus is that she disliked men versus women; disliked employees who were white versus employees of color; and disliked employees whom she perceived as American versus employees whom she perceived as foreign nationals or from Mexico.

81.     Beginning in July 2019, Ms. Rosa repeatedly told Mr. Wilkinson he was not a good employee because he was not a woman, specifically stating "you men aren't detailed oriented and shouldn't even be GMs [general managers]."

82.     Ms. Rosa repeatedly told Mr. Wilkinson as late as November 2019 that he was not a good employee because he was a white American, specifically telling him Rosa's "Mexican" employees "work harder, faster, and cheaper" than Mr. Wilkinson and his American colleagues at the Hampton Inn.

83.    Based on this racial, ethnic, and sex-based animus, Ms. Rosa consistently and constantly berated Mr. Wilkinson about his work performance without cause.

84.    In November 2019, the Hampton Inn in Covington was inspected and audited by the Hilton Hotel corporation, the corporate franchiser of the hotel property.

85.    When Mr. Wilkinson informed Ms. Rosa of the upcoming inspection, Rosa specifically asked Mr. Wilkinson if the inspector was a man or a woman.

86.    When Mr. Wilkinson informed her that the inspector was a man, Ms. Rosa expressed her disappointment and said that if the inspector had been a woman, she would have required Mr. Wilkinson to wear "tight pants" in order to "distract" the inspector.

87.    Mr. Wilkinson took this to mean that Rosa would have required Mr. Wilkinson to attempt to seduce or curry favor with the inspector using sex.

88.    Instead, because the inspector was a man, Rosa told Mr. Wilkinson she would bring an employee from another hotel who was a woman and a "looker" with "large breasts" to "distract" the inspector.

89.    Again, Mr. Wilkinson took this to mean that Rosa would force an employee from a different hotel property to pretend to be an employee assigned to the Hampton Inn in Covington and attempt to seduce or curry favor with the inspector using sex.

90.    In fact, Ms. Rosa actually did force a general manager from another hotel property named M.M. (a white, woman) to chaperone the male inspector during his review of the Hampton Inn.[1]

91.    In fact, Ms. Rosa forced M.M. to dress in revealing clothing during the inspection, as part of her plan to seduce or curry favor with the inspector.

---

[1]  Plaintiff refers to witnesses in this matter using only their initials to protect their privacy in this publicly filed document. Plaintiff will supplement with the full name of each witness during discovery.

**E.    Mr. Wilkinson Specifically Complains about Rosa's Unlawful Discrimination and Harassment but Management Takes No Action to Prevent It from Continuing**

92.    Mr. Wilkinson first complained about Ms. Rosa's discriminatory and harassing behavior to Russell Block around August 2019.

93.    Mr. Wilkinson specifically complained to Mr. Block that Ms. Rosa had engaged in a pattern of harassment specifically based on Mr. Wilkinson's race, ethnicity, and sex.

94.    Mr. Wilkinson specifically complained that unless Mr. Block took action and stopped Ms. Rosa's discrimination and harassment, Mr. Wilkinson would be forced to resign to escape the hostile work environment.

95.    Upon information and belief, Mr. Block took no steps whatsoever to prevent Ms. Rosa's constant discrimination and harassment, and the hostile work environment continued.

96.    Mr. Wilkinson consistently complained about Ms. Rosa's unlawful discrimination and harassment through the time of the Hilton franchiser inspection on or about November 22, 2019.

**F.    Mr. Wilkinson Specifically Complains about the Presence of What Appeared to Be Systemic and Uncontrolled Mold Infestations at Work**

97.    During the summer of 2019, the Hampton Inn also began suffering from a systemic and uncontrolled infestation of what appeared to Mr. Wilkinson to be black-colored mold.

98.    Mr. Wilkinson routinely began complaining to Rosa, Block, and owner Chris Patel about the infestation and the staff's inability to control it without additional resources.

99.    Mr. Wilkinson specifically warned management that he believed the mold risked making employees and guests sick.

100.    Mr. Wilkinson believed at the time that failing to properly remediate the mold was surely a violation of health code standards, environmental standards, or some other rule or regulation.

101.    MHS management and ownership including Rosa, Block, and Patel completely failed to take action or provide any means to remediate the mold.

102.    In fact, Ms. Rosa specifically told Mr. Wilkinson to stop using and to never use the word "mold" in any future company texts or emails, and that he should instead use a code word like "mangoes" or the letter "m" because the word mold made it sound like there was a health hazard at the hotel.

103.    On multiple occasions, Mr. Wilkinson asked for resources to remediate the mold including respirators and PPE equipment.

104.    Instead, Rosa, Block, and Patel told Mr. Wilkinson to have his employees or maintenance contractors to scrub the surfaces with water and bleach and then paint over them.

105.    The mold continued to spread throughout the hotel, through the vents, behind walls, under the baseboards, into picture frames and paintings.

106.    Meanwhile, in the runup to the Hilton franchiser inspection in November 2019, Rosa, Block, and Patel continued to fail to properly remediate the mold.

107.    Further, Rosa, Block, and Patel told Mr. Wilkinson to fire any employee or contractor at the Hampton Inn who refused to remediate or go near the mold without protective equipment, but Mr. Wilkinson refused.

108.    During the franchiser inspection, Rosa, Block, and Patel ordered Mr. Wilkinson to mark rooms out of order or mark that fake guests were occupying rooms with the worst mold outbreaks to prevent the inspector from seeing the worst of the infestation.

109.    Accordingly, upon information and belief, Mr. Wilkinson's constant complaints regarding the apparent mold infestation caused MHS, Pinnacle, Rosa, Block, and Patel to harbor retaliatory animus against him.

**G.      Management Terminates Mr. Wilkinson Based on His Race, Color, National Origin, Sex, and in Retaliation for His Prior, Protected Complaints**

110.     On December 19, 2019, Russell Block and Laura Rosa summoned Mr. Wilkinson to a meeting at the Hampton Inn.

111.     During the meeting, Ms. Rosa and Mr. Block terminated Mr. Wilkinson's employment.

112.     Mr. Block and Ms. Rosa presented Mr. Wilkinson with a written, termination letter.

113.     During the meeting, and in the termination letter they presented to Mr. Wilkinson, Ms. Rosa and Mr. Block indicated that they were dissatisfied with Mr. Wilkinson's work in various respects.

114.     Upon information and belief, Ms. Rosa and Mr. Block's purported dissatisfaction was merely pretext, and that the real reason for Mr. Wilkinson's termination was because of his race, color, national origin, sex, and in retaliation for Mr. Wilkinson's prior, protected complaints regarding Ms. Rosa's unlawful discrimination and harassment, and Mr. Wilkinson's prior, protected complaints regarding what he perceived as the health, safety, and environmental violations and environmental conditions regarding the uncontrolled infestation of mold at the Hampton Inn property.

115.     The opening paragraph of the termination letter provided to Mr. Wilkinson, and signed by both Mr. Block and Ms. Rosa, indicated that "This is to inform you that your employment with **My Hospitality via Hampton Inn** has been terminated effective immediately as of December 19, 2019." (emphasis added).

116.     The closing paragraph of the termination letter indicated that "We find it necessary to **terminate Shane Wilkinson's employment with My Hospitality as the General Manager of Hampton Inn, Covington, LA** Effective immediately as of December 19, 2019." (emphasis added)

15

**H.    Management Treated Mr. Wilkinson Worse Than His Comparators Under Similar Circumstances**

117.    Upon information and belief, immediately after his termination, Mr. Wilkinson was replaced by his assistant general manager, a woman named A.V.

118.    Upon information and belief, at the time of his termination, Mr. Patel and MHS employed approximately 22 general managers at various hotel properties throughout Louisiana and Mississippi.

119.    Upon information and belief, at the time of his termination, Mr. Wilkinson was the only male general manager within the MHS corporate family.

120.    Upon information and belief, once Mr. Wilkinson was terminated, Patel and MHS did not employ any male, general managers whatsoever.

121.    Likewise, during his employment, Ms. Rosa treated Mr. Wilkinson worse than his comparators under similar circumstances.

122.    For instance, as part of the Hilton audit, there was a set of administrative compliance goals that Mr. Wilkinson and his team had to accomplish to receive a passing grade.

123.    Upon information and belief, under the circumstances at the time outside the control of Mr. Wilkinson, it would have been impossible for Mr. Wilkinson and his team to accomplish every goal in the list.

124.    Regardless, Mr. Wilkinson and his team managed to accomplish enough of the goals to receive a passing grade.

125.    However, Ms. Rosa reprimanded and admonished Mr. Wilkinson for failing to accomplish all of the goals, even though it was impossible to do so and despite the fact they had passed the audit without harm or damage to the company.

126.    Upon information and belief, a similar audit had been performed on another general

16

manager of another hotel property under Rosa's supervision, M.D. (a white woman).

127.    Upon information and belief, M.D. and her team were in danger of failing the audit completely.

128.    Upon information and belief, Ms. Rosa either completed or otherwise fabricated M.D.'s paperwork in order for her to receive a passing grade.

129.    Upon information and belief, Ms. Rosa did not reprimand, admonish, or take any adverse action against M.D. for her failure to pass the same audit that Mr. Wilkinson had in fact passed without intervention from Ms. Rosa.

130.    Upon information and belief, the previously referenced, female general manager, M.M, was also subjected to a similar audit, but completely failed her administrative compliance goals and received a failing grade.

131.    Upon information and belief, Ms. Rosa did not reprimand, admonish or take any adverse action against M.M. for her failure to pass the same audit that Mr. Wilkinson had in fact passed without intervention from Ms. Rosa.

**I.    The Aftermath**

132.    After MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise terminated Mr. Wilkinson, he lost his employment and only source of income.

133.    After Mr. Wilkinson's termination, he has consistently but unsuccessfully sought comparable employment.

134.    Eventually, Mr. Wilkinson was forced to abandon his job search and start his own business to make ends meet and provide for his family.

135.    Mr. Wilkinson has suffered significant out of pocket expenses during his unemployment and self-employment.

136.    Due to the hostile work environment he was subject to and subsequent discriminatory and retaliatory termination, Mr. Wilkinson has suffered significant mental anguish and loss of enjoyment of life.

137.    Mr. Wilkinson is out a significant sum of lost wages, out-of-pocket expenses, and attorney fees incurred because of defendants' unlawful discrimination and termination.

## CAUSES OF ACTION

A.    **Unlawful Disparate-Treatment Discrimination and Hostile Work Environment Based on Race, Color, National Origin, and Sex against MHS and Pinnacle Under Title VII**

138.    Mr. Wilkinson states a cause of action for unlawful disparate-treatment discrimination and hostile work environment based on his race (white), color (white), national origin (United States of America and non-Hispanic ethnicity), and sex (male) against MHS and Pinnacle under Title VII.

139.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color . . . sex, or national origin[.]"  42 U.S.C. §2000e-2(a)(1).   An employer illegally demotes, terminates, or constructively discharges an employee based on his protected status when the status is at least one of the factors motivating the adverse action. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). In a Title VII action, an employer is vicariously liable for its decision-maker's discriminatory acts when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

129.    Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown." *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).  Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.*  "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

140.    Likewise, Title VII prohibits status-based harassment that is "severe or pervasive [enough] to alter the conditions of the victim's employment and create an abusive working environment." *Stewart v. Miss. Transp. Commission*, 586 F.3d 321, 328 (5th Cir. 2009).  A plaintiff states a prima facie case for status-based hostile work environment by showing "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome harassment; (3) that harassment was based on [that status]; (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action." *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 858–59 (S.D. Tex. 2010).

141.    In this case, Mr. Wilkinson had enjoyed great success at the Hampton Inn in Covington prior to Laura Rosa becoming his supervisor.  He received multiple promotions and raises as part of that success.  Within weeks of Ms. Rosa's promotion to Regional Manager of Operations, she began discriminating, harassing, and reprimanding Mr. Wilkinson based on his sex, race, color,

and national origin, because she believed and often said that her employees who were women made better general managers than men, or her employees who were of color, or ethnically Latino, or of Mexican national origin "work harder, faster, and cheaper" than Mr. Wilkinson and his white, non-Hispanic, or American colleagues at the Hampton Inn.

142.    Likewise, Ms. Rosa suggested that had the Hilton franchiser inspector that inspected the Hampton Inn property in November 2019 had been a woman, she would have forced Mr. Wilkinson to wear provocative clothing to try and seduce or curry favor with the inspector using his sex.  When Rosa found out the inspector was a man, she told Mr. Wilkinson she would force an employee from another hotel who was a "looker" with "large breasts" to do the same.  Then, in fact, Rosa did force another woman from another hotel to chaperone the inspector on his inspection.

143.    When Mr. Wilkinson underwent auditing, he passed without any assistance from Rosa, but Rosa reprimanded him anyway.  But when Mr. Wilkinson's comparators who were women and general managers from other hotel properties failed or were in danger of failing their audits, Rosa either assisted them to pass, fabricated paperwork to ensure they passed, or otherwise did not reprimand them for their failures.

144.    When Rosa and Russell Block terminated Mr. Wilkinson on December 19, 2019, they offered pretextual reasons for dissatisfaction with his employment.  Upon information and belief, the real reason motivating management's decision to terminate Mr. Wilkinson's employment was his race, color, national origin, and sex.  That is to say, but-for Mr. Wilkinson's race, color, national origin, and sex, he would not have been terminated.

145.    Immediately after management terminated Mr. Wilkinson's employment, management replaced him with his assistant manager, a woman.

146.    Thus, upon information and belief, at the time of Mr. Wilkinson's termination, across approximately 22 other hotel properties, MHS management employed only women and no men in the position of general manager.

147.    At all times relevant to this lawsuit, Pinnacle and MHS either constituted a single, integrated enterprise, or Pinnacle was merely the alter ego of MHS.

148.    Accordingly, MHS and Pinnacle are liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Mr. Wilkinson resulting from his unlawful termination and the hostile work environment he suffered, including, but not limited to, back pay, front pay or reinstatement, punitive damages, compensatory damages, non-compensatory damages, mental anguish and loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**B.    Unlawful Disparate-Treatment Discrimination Based on Retaliation against MHS and Pinnacle under Title VII**

149.    Mr. Wilkinson states a cause of action for disparate treatment discrimination based on retaliation against MHS and Pinnacle under Title VII.

150.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a).  In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)). "Close timing between an

employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action. *See e.g., Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

151.    In this case, Mr. Wilkinson made several complaints to MHS Director of Operations Russell Block against Ms. Rosa specifically raising the allegations of race-based, sex-based, national-origin-based, and race-and-sex based discrimination and harassment. Upon information and belief, Mr. Block did nothing to prevent future harassment and discrimination, and Ms. Rosa's unlawful treatment continued. Eventually, on December 19, 2019, MHS, or Pinnacle, or the MHS-Pinnacle Integrated Enterprise terminated Mr. Wilkinson's employment for pretextual reasons. Upon information and belief, management would not have terminated Mr. Wilkinson's employment but for his prior, protected complaints of unlawful discrimination and hostile work environment.

152.    Upon information and belief, at all times, owners and management of MHS, including Yogesh Patel, Russell Block, and Laura Rosa knew that their retaliation was unlawful under federal law, but they persisted in their course of conduct anyway, and in the full scope of their employment responsibilities at MHS.

153.    Accordingly, MHS and Pinnacle are liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Mr. Wilkinson

resulting from his unlawful termination and the hostile work environment he suffered, including, but not limited to, back pay, front pay or reinstatement, punitive damages, compensatory damages, non-compensatory damages, mental anguish and loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**C.    Unlawful Disparate Treatment Discrimination and Hostile Work Environment Based on Race, Color, National Origin, Sex, and Retaliation under the Louisiana Employment Discrimination Law (as Amended) against MHS and Pinnacle**

154.    Mr. Wilkinson states a cause of action for unlawful disparate-treatment discrimination and hostile work environment based on his race (white), color (white), national origin (United States of America and non-Hispanic ethnicity), and sex (male), as well as disparate-treatment discrimination based on retaliation, against MHS and Pinnacle under the Louisiana Employment Discrimination Law (as amended).

155.    Under the LEDL, no employer may discriminate against an employee based on his race, color, national origin, or sex.  La. Rev. Stat. Ann. § 23:332 *et seq.*  Louisiana's anti-discrimination statute is modeled after Title VII, and therefore analysis of the two statutes are functionally identical.  Likewise, under La. Rev. Stat. Ann. § 51:2256 *et seq.*, no employer may "retaliate . . . in any manner against a person because he has opposed a practice declared unlawful under [the LEDL]."

156.    Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination, hostile work environment, and retaliation under Title VII against MHS and Pinnacle, both MHS and Pinnacle are likewise liable to Mr. Wilkinson for all his damages arising from MHS and Pinnacle's unlawful disparate treatment discrimination, hostile work environment, and retaliation,

including, but not limited to, lost back wages, lost front wages, reinstatement, compensatory damages, non-compensatory damages, mental anguish and loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**D.    Unlawful Race-Based Discrimination, Harassment, and Retaliation in Violation of Section 1981 against MHS, Pinnacle, Mr. Patel, Ms. Rosa, and Mr. Block in Their Individual Capacities**

157.    Mr. Wilkinson states a cause of action for unlawful disparate-treatment discrimination and hostile work environment based on Mr. Wilkinson's race (white), color (white), and ethnicity (non-Hispanic), and disparate-treatment discrimination based on retaliation, against MHS and Pinnacle under 42 U.S.C. § 1981.

158.    Pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended), "all persons in the United States shall have the same contractual rights as white citizens" and an employer may not discriminate against its non-white employees on the basis of their race. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996) (citing 42 U.S.C. § 1981(a)). Whether an employer violates Section 1981 is determined under the same analysis as a Title VII claim. *LaPierre*, 86 F.3d at 448. In a Section 1981 action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807 (5th Cir. 2000).

159.    In a Section 1981 action, the individual decision-maker who purposefully engages in racially discriminatory acts or retaliation, although not the victim's actual employer, is liable under Section 1981. *See Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988).

160.    The framework for determining whether MHS, Pinnacle, Mr. Patel, Ms. Rosa, and Mr.

Block's liability under Section 1981 is identical to that used under Title VII.

161.    Plaintiff hereby incorporates and re-alleges here all prior allegations in this Complaint.

162.    Specifically, in this case, Mr. Wilkinson had enjoyed great success at the Hampton Inn in Covington prior to Laura Rosa becoming his supervisor.  He received multiple promotions and raises as part of that success.  Within weeks of Ms. Rosa's promotion to Regional Director of Operations, she began discriminating, harassing, and reprimanding Mr. Wilkinson based on, relevant here, his race and ethnicity, directly and often telling Mr. Wilkinson her employees who were not white, or of color, or ethnically Latino, "work harder, faster, and cheaper" than Mr. Wilkinson and his other white, non-Hispanic, or American colleagues at the Hampton Inn.  Mr. Wilkinson complained directly to Mr. Block about this harassing conduct, specifically that if Mr. Block did not remedy it, Mr. Wilkinson would be forced to resign.  Upon information and belief, Mr. Block did not nothing to remedy Mr. Rosa's misconduct; the misconduct continued; and Ms. Rosa continued to pretextually discipline Mr. Wilkinson, culminating in his termination on December 19, 2019.

163.    Upon information and belief, Ms. Rosa and Mr. Block terminated Mr. Wilkinson because of his race, and because he had made prior, protected complaints of unlawful race-based discrimination and hostile work environment.  In other words, but-for Mr. Wilkinson's race and prior protected complaints, he would not have been terminated.

164.    Upon information and belief, MHS and Pinnacle owner Yogesh Patel either directed or approved Mr. Wilkinson's termination.

165.    Upon information and belief, Mr. Patel likewise decided to terminated Mr. Wilkinson's employment based on his race and in retaliation for Mr. Wilkinson's prior, protected complaints of unlawful race-based discrimination and hostile work environment.

166.    Accordingly, pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended) MHS, Pinnacle, Ms. Rosa, Mr. Block, and Mr. Patel are jointly and severally liable for all actual and statutory damages suffered by Mr. Wilkinson resulting from his harassment and discriminatory termination, including, but not limited to, back pay, front pay or reinstatement, punitive damages, compensatory damages, non-compensatory damages, mental anguish damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**E.    Unlawful Disparate-Treatment Discrimination based on Retaliation against MHS and Pinnacle under Louisiana's Environmental Whistleblower Statute**

167.    Mr. Wilkinson states a cause of action of disparate-treatment discrimination based on retaliation against MHS and Pinnacle under Louisiana's Environmental Whistleblower Statute, Louisiana Revised Statute 30:2027.

168.    Pursuant to Louisiana's Environmental Whistleblower Statute, "No firm, business, private or public corporation, . . .  shall act in a retaliatory manner against an employee, acting in good faith, who . . . Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation." La. R.S. 30:2027(A).  Louisiana courts have held that the language of La. R.S. 30:2027 supports five requirements for a cause of action: "(1) the employee acts in good faith; (2) the employee reports, or threatens to report, a violation; (3) the employee reasonably believes the activity, policy, or practice undertaken by his employer, or another employer with whom there is a business relationship with his employer, is a violation of an environmental law; (4) the employee reports, or threatens to report, the violation to a supervisor or to a public body of the employer; and (5) employer acts in a retaliatory manner because the employee reported, or threatened to report, a

26

violation." Collins v. State, 118 So.3d 43, 49 (La. App. 2013).

169.    In the present case, Mr. Wilkinson was at all times acting in good faith by making complaints regarding what he in good faith perceived to be a hazardous mold infestation occurring in the hotel.  Mr. Wilkinson made multiple complaints, including pictures of the infestation, and made requests for the means to remediate the problem.  Mr. Wilkinson believed at all times that the failure to properly remediate the mold while continuing to allow guests to stay in the hotel was surely a violation of Louisiana state or local environmental laws, rules, or regulations.  Mr. Wilkinson did in fact report the alleged violations to all of his superior supervisors.  Management ordered Mr. Wilkinson to terminate any employees who refused to work without appropriate, protective equipment around the mold, but Mr. Wilkinson refused.  Ultimately, upon information and belief, MHS and Pinnacle refused to act upon the complaints and in fact attempted to cover up the problem, both literally, by painting over the mold, and figuratively, by silencing Mr. Wilkinson with instructions not to use the word "mold" in official communications and ultimately, terminating him for his complaints.

170.    La. R.S. 30:2027(B)(1) states: "Any employee against whom any action is taken as a result of acting under Subsection A of this Section may commence a civil action in a district court of the employee's parish of domicile, and shall recover from his employer **triple damages** resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit, including attorney's fees, if the court finds that Subsection A of this Section has been violated. In addition, the employee shall be entitled to all other civil and criminal remedies available under any other state, federal, or local law."

171.    La. R.S. 30:2027(B)(2)(b) states "'Damages' to be tripled pursuant to Paragraph B(1) of this Section shall be for the period of the damage, but not to exceed three years, and shall include

27

but not be limited to lost wages, lost anticipated wages due to a wage increase, or loss of anticipated wages which would have resulted from a lost promotion, and if the period of the damage exceeds three years, the employee shall thereafter be entitled to actual damages. In addition to the above, 'damages' shall also include any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom."

172.    Accordingly, MHS and Pinnacle are liable, both directly and vicariously through its officers and employees, for all actual and statutory damages suffered by Mr. Wilkinson resulting from his retaliatory termination, including, but limited to, triple the amount of up to three years of lost back and future wages, actual lost wages, future lost wages, mental anguish damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees incurred in this action, and all other appropriate, equitable relief.

**F.    Unlawful Disparate-Treatment Discrimination based on Retaliation against MHS and Pinnacle under Louisiana's Whistleblower Statute**

173.    Alternative to Mr. Wilkinson's claim of unlawful retaliation in violation of Louisiana's Environmental Whistleblower Statute, Mr. Wilkinson states a cause of action of unlawful disparate-treatment discrimination based on retaliation against MHS and Pinnacle under Louisiana's Whistleblower Statute, Louisiana Revised Statute 23:967.

174.    Pursuant to Louisiana's Whistleblower Statute, "An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law: (1) Disclose or threatens to disclose a workplace act or practice that is in violation of state law. . . . (3) Objects to or refuses to participate in an employment act or practice that is in violation of law." La. R.S. 23:967.

175.    In the present case, Mr. Wilkinson was at all times acting in good faith by making complaints regarding what he in good faith perceived to be a hazardous mold infestation occurring

in the hotel.  Mr. Wilkinson made multiple complaints, including pictures of the infestation, and made requests for the means to remediate the problem.  Mr. Wilkinson believed at all times that the failure to properly remediate the mold while continuing to allow guests to stay in the hotel was surely a violation of Louisiana state or local environmental laws, rules, or regulations.  Mr. Wilkinson did in fact report the alleged violations to all of his superior supervisors.  Management ordered Mr. Wilkinson to terminate any employees who refused to work without appropriate, protective equipment around the mold, but Mr. Wilkinson refused.  Ultimately, upon information and belief, MHS and Pinnacle refused to act upon the complaints and in fact attempted to cover up the problem, both literally, by painting over the mold, and figuratively, by silencing Mr. Wilkinson with instructions not to use the word "mold" in official communications and ultimately, terminating him for his complaints.

176.    Accordingly, MHS and Pinnacle are liable, both directly and vicariously through its officers and employees, for all actual and statutory damages suffered by Mr. Wilkinson resulting from his retaliatory termination, including, but limited to, lost back wages, lost future wages, mental anguish damages, legal costs, pre-judgment and post-judgment interest, Mr. Wilkinson's reasonable attorney's fees incurred in this action, and all other appropriate, equitable relief.

**JURY DEMAND**

Mr. Wilkinson demands a trial by jury on all issues and causes of action in this matter.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Shane Wilkinson prays that his complaint be deemed good and sufficient; that it summons be served upon defendants My Hospitality Services, LLC; Pinnacle Lodging LLC; Yogesh "Chris" Patel; Laura Rosa; and Russell Block; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendants (1) declaring that

defendants did intentionally discriminate and retaliate (as the case may be) against plaintiff based on his race, color, national origin, sex, and protected complaints regarding defendant's unlawful employment misconduct, (2) legal relief with respect to plaintiff's race, color, national origin, sex, and state-law claims, up to and including lost back wages, lost future wages, compensatory damages, statutory damages litigation costs, reasonable attorney's fees, and (for only plaintiff's federal claims under Title VII and Section 1981) punitive damages, and (for only plaintiff's state claims under the Louisiana Environmental Whistleblower Statute) trebled damages; and (3) all other legal and equitable relief to which plaintiff may be entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Shane Wilkinson*

**Clerk: please hold service pending attempt at waiver of service of summons**